# In the United States Court of Federal Claims

**No. 10-707C**
**Filed: March 28, 2013**
**Redacted Version Issued for Publication: April 18, 2013[1]**

```
* * * * * * * * * * * * * * *   *
OASIS   INTERNATIONAL   WATERS,   *
INC.,                            *
                                 *
              Plaintiff,         *          Attorney-Client Privilege;
       v.                        *          Waiver; Federal Rule of
                                 *          Evidence 502; Clawback
UNITED STATES,                   *          Order
                                 *
              Defendant.         *
                                 *
* * * * * * * * * * * * * * *   *
```

## O R D E R

**HORN, J.**

Defendant, the United States, has moved to substitute redacted pages for unredacted pages contained in a Joint Appendix filed on August 21, 2012, which correspond to a thirteen-page document titled "Memorandum for Record."[2]  Defendant

---

[1] This Order was issued under seal on March 28, 2013.  The parties were asked to propose redactions prior to public release of the Order.  Where words have been redacted, it is reflected with the following notation: "[redacted]."

[2] As explained below, although defendant's motion "requests that the Court substitute pages 930-42 of the joint appendix, with the attached copy of the identical memorandum for record (MFR) with privileged passages redacted," the version of the memorandum attached to defendant's motion does not include the last page of the version of the Memorandum contained in the Joint Appendix.  Four different versions of the Memorandum have been disclosed to plaintiff and a separate in camera version of the Memorandum has been submitted to the court.  The four versions of the Memorandum previously disclosed to plaintiff include: (1) the redacted version of the Memorandum that defendant attached to its motion, (2) a second, redacted version of the Memorandum that defendant filed on the court's electronic filing system in support of its motion, which includes the last page missing from the unredacted version of the Memorandum that defendant attached to its motion to substitute appendix pages, but which otherwise contains the same redactions, (3) a partially redacted version of the Memorandum, four copies of which defendant produced to plaintiff during discovery with

also has moved to compel plaintiff, Oasis International Waters, Inc. (Oasis), to apply conforming redactions to its copy of the unredacted version of the Memorandum that appears in the Joint Appendix, which plaintiff had obtained prior to the start of the litigation. Although the Memorandum is undated, on the last page of the Memorandum, the date September 1, 2006 appears above a note indicating that questions regarding "the legal analysis" reflected in the memorandum should be referred to a Judge Advocate, Major (Maj.) Michael S. Martin.

The government seeks to redact material from four passages of the Memorandum, which allegedly contain "recitations of legal advice," pursuant to the attorney-client privilege, and which in their entirety compromise ten sentences and a signature block. The Memorandum discusses the government's reasoning for issuing the eleventh modification (P00011) to Contract No. W27P4A-05-C-0002, which is at issue in the above-captioned case. Lieutenant Colonel (Lt. Col.) Renee Richardson,[3] the sixth contracting officer assigned to the contract, appears to have drafted the Memorandum in conjunction with other individuals in 2006. Although inexplicably absent from the redacted version of the Memorandum that defendant seeks to place in the Joint Appendix, Lt. Col. Richardson's signature appears on the second-to-last page of the version of the Memorandum currently in the Joint Appendix, along with the signature of Lieutenant Colonel (LTC) Craig A. Dedecker.

Plaintiff alleges that, on August 3, 2012, it produced to defendant the unredacted version of the Memorandum that appears in the Joint Appendix, which is only partially legible, and which, as described below, plaintiff had received prior to filing its complaint in the above-captioned case. When the parties filed the Joint Appendix with the court on August 21, 2012, in the notice of filing the Joint Appendix the parties stated that, "by filing the Joint Appendix, neither party waives any objection to any document contained within the Joint Appendix."

In a lengthy response, which recites numerous discovery disputes between the parties, plaintiff asserts that the disputed passages are not privileged because they either do not reflect legal advice or do not constitute attorney-client communications. Although plaintiff had obtained the unredacted version of the Memorandum that appears in the Joint Appendix prior to the start of the litigation, plaintiff points out that, during the course of discovery, defendant had produced to Oasis four copies of a separate, partially redacted version of the Memorandum that discloses portions of the passages that defendant now seeks to redact. Specifically, plaintiff notes that "the Government's production of documents to Oasis contained at least four other copies of the MFR [Memorandum for Record]" and that the redactions in these four copies of the partially redacted version of the Memorandum are inconsistent with the redactions contained in the redacted version of the Memorandum attached to defendant's motion to substitute

identical redactions, and (4) the unredacted version of the Memorandum that appears in the Joint Appendix, which apparently plaintiff had acquired in 2007.

[3] Lt. Col. Richardson achieved the rank of Colonel after the events described in this Order.

2

pages in the Joint Appendix. Plaintiff also alleges that Lt. Col. Richardson revealed the substance of the attorney-client communications relating to the subject matter of the Memorandum to plaintiff's subcontractor, Al-Morrell Development, Inc. (Al-Morrell), in a series of emails that Lt. Col. Richardson sent in 2006 while she was the contracting officer assigned to the contract.

In its motion, defendant has proposed redactions to the Memorandum pursuant to the Clawback Order the court entered at the request of the parties, in order not to "effectuate a waiver of a privilege as a result of an inadvertent disclosure of privileged materials" during discovery. Plaintiff, however, contends that the Clawback Order is inapplicable to the unredacted version of the Memorandum that was included in the Joint Appendix because plaintiff did not obtain the unredacted version through discovery. Plaintiff maintains that it had obtained a copy of the unredacted version of the Memorandum that appears in the Joint Appendix nearly three years before the litigation was initiated. Plaintiff alleges that Anthony Painter, plaintiff's "representative" and an employee of plaintiff's labor and equipment subcontractor, Al-Morrell, obtained the unredacted version of the Memorandum in December 2007 from Benjamin Jenkins, who, according to plaintiff, was "Oasis's primary day-to-day Government point of contact for matters related to the Contract," although Mr. Jenkins worked for CACI International, Inc. (CACI), which held a separate contract with the government. Upon receipt from Mr. Jenkins, on December 7, 2007, Mr. Painter forwarded the unredacted version of the Memorandum to Al-Morrell's management, which then apparently forwarded the Memorandum to plaintiff's management. According to filings submitted to the court by the parties, at the time of his alleged disclosure of the unredacted version of the Memorandum to Mr. Painter, Mr. Jenkins provided administrative support to Commander (CDR) Kenneth Broomer, a contracting officer assigned to the contract in 2007. During his deposition on July 18, 2012, when asked what his job title was, Mr. Jenkins responded: "I was -- I think CACI called us acquisition specialists. But I -- I was an acquisition specialist." The contract that hired CACI was for "four Contract Specialists, and one System Administrator."

Plaintiff also argues that defendant has waived any privilege it may have had regarding the unredacted version of the Memorandum because Mr. Jenkins, as a government representative, "willfully and voluntarily" disclosed the document to Mr. Painter. Specifically, plaintiff alleges that defendant waived the privilege "[o]n or about December 7, 2007," when Mr. Jenkins handed an envelope containing the Memorandum to Mr. Painter. In a declaration made under penalty of perjury, Mr. Painter describes his interaction with Mr. Jenkins as taking place in an open office with "five or ten other people" present, but does not indicate that others in the office knew that the interaction had taken place. Mr. Painter further notes that Mr. Jenkins "said words to the effect of 'Here, you guys will find this interesting; open it back at your office.'" Mr. Painter also does not recall "seeing or thinking that Mr. Jenkins was attempting to conceal his actions." Mr. Painter does not recall any protective markings on the envelope, which is consistent with the lack of protective markings on the unredacted version of the Memorandum that was allegedly contained within the envelope, which now appears in the Joint Appendix.

3

In addition to Mr. Jenkins' turning over of the Memorandum to Mr. Painter in December 2007, plaintiff contends that defendant waived the privilege in 2006, when Lt. Col. Richardson sent a series of emails revealing allegedly privileged communications to Paul Jeffries, the Chief Executive Officer of Al-Morrell. In these emails, Lt. Col. Richardson disclosed that she disagreed with legal counsel's strategy for structuring the contract and that legal counsel wanted to put defendant on "better footing to argue that this is a true service contract." Lt. Col. Richardson further explained that "the attorneys are concerned about us being on firm fiscal footing and therefore want to show we are paying for the services and the use of the equipment." These emails, according to plaintiff, overlap with the substance of the summaries of attorney-client communications contained in the Memorandum. Plaintiff contends, therefore, that "[t]here is simply no argument that, having contemporaneously shared with Oasis the thoughts of counsel on the structure of the Contract, the Government can now retreat from that position and claim privilege as to a brief summary of counsel's opinion." Plaintiff insists that Lt. Col. Richardson's disclosure in 2006, and Mr. Jenkins' alleged disclosure in 2007, have resulted in a "complete subject matter waiver" of the privilege, entitling plaintiff to "discover *all* documents related to the structure of this Contract and regarding which the Government has now asserted attorney-client privilege." (emphasis in original).

Defendant responds that plaintiff "cannot seriously contest that the short redacted passages in the MFR [Memorandum for Record] contain recitations of legal advice that meet the standard for protected attorney-client communications." Defendant also argues that plaintiff knew that Mr. Jenkins had no authority to disclose the Memorandum because Paul Morrell, the President of Oasis, expressed concern in response to an email from Mr. Jeffries that the Memorandum's disclosure "'could cost our contact his job.'" Defendant, accordingly, interprets the "drop off of the confidential documents" as proof that Mr. Jenkins acted surreptitiously in disclosing privileged communications to Mr. Painter and, therefore, that Mr. Jenkins had no authority to waive the privilege for defendant. Defendant also asserts that plaintiff "had previously cultivated 'inside source[s]' for information regarding the Government's bargaining strategy." (alteration in original). Defendant accuses plaintiff of having "a practice of attempting to obtain information outside normal channels," asserting that plaintiff "cannot contend that any disclosure was accidental or in good faith" and that plaintiff "knew what it was doing." Defendant alleges that waiver cannot apply in circumstances in which disclosure results from such "'betrayal or connivance.'"

Plaintiff rejects defendant's characterizations as "the insinuation, nay, the affirmative assertion – supported by nothing other than counsel for Defendant's fanciful interpretation of one email – that Oasis had a nefarious practice of 'cultivat[ing] "inside sources"' and acting in bad faith." (alteration in original). Plaintiff also characterizes defendant's accusations as "a gratuitous smear," describes defendant's motion as an "unfortunate, meritless smear," and claims, "[t]his is, at the very least, very unseemly conduct by counsel for the United States."

Unfortunately, this type of exchange of heightened rhetoric between the parties is representative of the interactions between the parties since this case began. Although the court continues to urge the parties to cooperate with each other in order to expedite the case, without further exchanges of unproductive rhetoric, at this time, the court's attention is directed at defendant's motion and the four passages in the Memorandum currently at issue before the court. Because portions of the passages at issue are partially legible in the unredacted version of the Memorandum that appears in the Joint Appendix, the court requested a more legible copy of the Memorandum from defendant for in camera review. Plaintiff's filings with the court, however, indicate that plaintiff was able to discern the contents of the unredacted version of the Memorandum that appears in the Joint Appendix. The court, accordingly, discloses the contents of the Memorandum in this Order.

The first passage defendant seeks to redact consists of four sentences on page 4 of the Memorandum, located at Bates number US 00008229, under the heading "Contract Type Resolution." The passage appears, for the most part, to summarize legal advice received by Lt. Col. Richardson from Joint Contracting Command Iraq/Afghanistan (JCCI/A). The passage is legible in the unredacted version of the Memorandum that appears in the Joint Appendix. The section of the Memorandum that contains the first passage, generally describes the parties' negotiations regarding converting the contract into an indefinite delivery/indefinite quantity contract. Although defendant does not seek to redact the phrase, "JCCI/A Legal recommended," defendant contends that the remainder of the following passage is privileged:

JCCI/A Legal recommended [redacted].

Defendant's proposed redaction of this passage is consistent with the redactions defendant made in the four copies of the partially redacted version of the Memorandum produced by defendant to plaintiff during discovery after the above-captioned litigation was commenced.

The second passage defendant seeks to redact consists of one sentence in the first paragraph on page 5 of the Memorandum, located at Bates number US 00008230, under the heading "Statement of Objectives/Performance-Based Work Statement," and is bolded below:

The Contracting Officer, with significant consultation with JCCI/A Legal, and the Contractor worked together to produce a Performance-Based Work Statement (PBWS) to replace the Statement of Objectives. **This included an operating lease for the bottling facilities and associated equipment—this concept was approved by the HCA [Head of the Contracting Activity] (see 10 Aug/10:58 e-mail under "Legal Review").** The PBWS reflects the Contractor employed to operate USG-controlled equipment, run with USG fuel, and processing USG-provided water. The performance requirements summary establishes minimal

5

service requirements that were absent from the previous Statement of Objectives.

(brackets and emphasis added). The second passage is partially legible in the unredacted version of the Memorandum that appears in the Joint Appendix. Defendant left unredacted a portion of the sentence it now seeks to redact in the four copies of the partially redacted version of the Memorandum that defendant previously produced to plaintiff during discovery, namely the following: "This included an operating lease for the bottling facilities and associated equipment—," while redacting only the phrase "this concept was approved by the HCA (see 10 Aug/10:58 e-mail under 'Legal Review')."

The third passage that defendant seeks to redact includes five sentences in the last paragraph of that same page 5, which is located at Bates number US 00008230, under the heading "CLIN [contract line item number] Structure." The sentences state:

> Legal Counsel [redacted]. To accomplish this, the Government and Contractor agreed to establish a priced CLIN for Bottled Water production capability with non-priced CLINs for production capability for each facility. Additionally, the Government established a new non-priced CLIN for equipment lease, [redacted]. The revised CLIN structure is listed as capability per plant and a water production equipment lease for each option period.

A portion of the second passage is partially legible in the unredacted version of the Memorandum that appears in the Joint Appendix. The two sentences preceding the second passage state: "This CLIN structure was not conducive to the operation of a service contract. P00011 revamped the CLIN structure to clearly reflect a bottled water capability contract (service)." Defendant does not seek redaction of either of these two preceding sentences.

In the four copies of the partially redacted version of the Memorandum that defendant previously produced to plaintiff during discovery, defendant left unredacted in the passage at issue the reference in the first sentence to "Legal Counsel," as well as the second sentence, a portion of the third sentence, and all of the fifth sentence. Specifically, the four copies of the partially redacted version of the Memorandum did not redact the following:

> Legal Counsel [previously redacted] To accomplish this, the Government and Contractor agreed to establish a priced CLIN for Bottled Water production capability with non-priced CLINs for production capability for each facility. Additionally, the Government established a new non-priced CLIN for equipment lease [previously redacted] The revised CLIN structure is listed as capability per plant and a water production equipment lease for each option period.

6

Finally, the fourth passage that defendant seeks to redact is located on the first "Page 12 of 12" of the Memorandum beneath the signatures of Lt. Col. Richardson and LTC Dedecker (Principal Assistant Responsible for Contracting – Forces), at Bates number US 00008237. The fourth passage states: "This memo was endorsed by: Major Michael S. Martin, USAF Deputy Command Judge Advocate Joint Contracting Command – Iraq/Afghanistan *See next page.*" (emphasis in original). The fourth passage is almost completely legible in the unredacted version of the Memorandum that appears in the Joint Appendix. Defendant left the fourth passage entirely unredacted in the four copies of the partially redacted version of the Memorandum previously produced to plaintiff during discovery. The referenced "next page" after the fourth passage contains the following statement above what appears to be Maj. Martin's signature:

> I concur with the foregoing summary of JA involvement with restructuring contract W27P4A-05-C-0002. Detailed questions concerning the legal analysis of the revised CLIN structure should be directed to my attention.

Maj. Martin's signature is completely legible in the four copies of the partially redacted version of the Memorandum that defendant produced to plaintiff during discovery. Although the signature is unreadable in the in camera version of the Memorandum and the unredacted version of the Memorandum that appears in the Joint Appendix, immediately below the signature appear the words "MICHAEL S. MARTIN, Maj. USAF Deputy Command Judge Advocate Joint Contracting Command – Iraq / Afghanistan." Defendant does not seek to redact this statement, perhaps because the majority of this page is illegible in the unredacted version of the Memorandum that appears in the Joint Appendix. Defendant, however, redacted the statement appearing above Maj. Martin's signature, indicating, in part, that Maj. Martin "concur[ed] with the foregoing summary of JA involvement with restructuring contract W27P4A-05-C-0002," in the four copies of the partially redacted version of the Memorandum that defendant previously produced to plaintiff during discovery.

Applicability of the Attorney-Client Privilege

In order to determine whether defendant's motion should be granted, the court must first determine whether the attorney-client privilege applies to the contents of the four passages defendant seeks to redact, and, if applicable, whether defendant previously had waived the privilege. In general, "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged." Fisher v. United States, 425 U.S. 391, 403 (1976) (citing 8 Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961)); see also Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997). The purpose of the attorney-client privilege is "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). The privilege, however, "'does not shield all information that a client divulges to an attorney, or vice versa, but rather is limited to instances where

7

legal advice is sought or rendered.'" Deseret Mgmt. Corp. v. United States, 76 Fed. Cl. 88, 90 (2007) (quoting Pac. Gas & Elec. Co. v. United States, 69 Fed. Cl. 784, 810, recons. denied, Nos. 04–74C, 04–75C, 2006 WL 6735871 (Fed. Cl. 2006)); see also Upjohn Co. v. United States, 449 U.S. at 390 (The attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." (citations omitted)).  The privilege is not limited to the attorney-client communications of private litigants.  See Deseret Mgmt. Corp. v. United States, 76 Fed. Cl. at 91 (It is understood that, "[c]ommunications by the Department of Justice to a client agency and by that agency's own attorneys to non-attorney personnel seeking or being provided with legal advice are entitled to protection under the attorney-client privilege." (citations omitted)); Testwuide v. United States, No. 01–201L, 2006 WL 5625760, at *4 (Fed. Cl. Aug. 7, 2006) ("[L]ike any other organization, a government agency can be a client." (citing Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 863 (D.C. Cir. 1980))); Deterium Corp. v. United States, 19 Cl. Ct. 697, 699 (1990).  The attorney-client privilege protects an attorney's communication to a client only when it reveals, "directly or indirectly, the substance of a confidential communication by the client" made for the purpose of obtaining legal advice.  Am. Standard Inc. v. Pfizer Inc., 828 F.2d 734, 745 (Fed. Cir. 1987) (citing Ohio-Sealy Mattress Mfg. Co v. Kaplan, 90 F.R.D. 21, 28 (N.D. Ill. 1980)); see also Salem Fin., Inc. v. United States, 102 Fed. Cl. 793, 800 (2012) (noting that the privilege does not apply to all communications from an attorney to a client); Cencast Servs., L.P. v. United States, 91 Fed. Cl. 496, 502 (2010).

"The party asserting the privilege bears the burden of establishing its applicability." Cencast Servs., L.P. v. United States, 91 Fed. Cl. at 502 (citing AAB Joint Venture v. United States, 75 Fed. Cl. 448, 456 (2007)).  A client's communication with his or her attorney, however, is typically assumed to involve a request for legal advice, "'unless it clearly appears to be lacking in aspects requiring legal advice.'"  Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306, 315 (2002) (emphasis removed) (quoting 8 Wigmore, Evidence § 2296); see also United States v. Chen, 99 F.3d 1495, 1501–02 (9th Cir. 1996), cert. denied, 520 U.S. 1167 (1997).  "The presumption that the client sought legal advice may not operate in the context of in-house counsel particularly when the person holding that position also holds an executive position within the client company." See Paul R. Rice, Attorney-Client Privilege in the United States § 7.30, at 1238–39 (2012).  Compare United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) ("Because in-house counsel may operate in a purely or primarily business capacity in connection with many corporate endeavors, the presumption that attaches to communications with outside counsel does not extend to communications with in-house counsel." (citation omitted)), with Boca Investerings P'ship v. United States, 31 F. Supp. 2d 9, 12 (D.D.C. 1998) ("There is a presumption that a lawyer in the legal department or working for the general counsel is most often giving legal advice, while the opposite presumption applies to a lawyer . . . who works for the Financial Group or some other seemingly management or business side of the house." (citation omitted)).  Regardless of whether a communication is assumed to be a request for legal advice, if the "overall tenor" of a document reflects a request for legal advice, it is not necessary "to dissect the document to separately evaluate each of its

8

components." In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 806 (Fed. Cir. 2000) (applying Federal Circuit law); see also Cencast Servs., L.P. v. United States, 91 Fed. Cl. at 506 (citing Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. at 315); First Heights Bank, FSB v. United States, 46 Fed. Cl. 312, 315 (holding that party may meet its burden of establishing the applicability of the privilege by demonstrating that documents "consist largely" of requests for legal advice), motion for clarification granted in part and denied in part, 46 Fed. Cl. 827 (2000).

Although the privilege protects communications that indirectly disclose a client's request for legal advice, it does not apply when an attorney acts as a client's business or economic advisor. See In re Google Inc., 462 F. App'x 975, 978 (Fed. Cir. 2012) (noting, while applying Ninth Circuit law, that "[i]t is beyond dispute that parties seeking to establish the privilege are required to sufficiently establish the communication at issue relates to professional legal services (as opposed to business considerations), regardless of whether the attorney had distinct non-legal responsibilities for the company" (citing United States v. Rowe, 96 F.3d 1294, 1297 (9th Cir. 1996))); In re Spalding Sports Worldwide, Inc., 203 F.3d at 805–06 (applying Federal Circuit law when rejecting the argument that the submission of an invention record to a "patent committee," which made business decisions, constituted an unprivileged request for business advice); Energy Capital Corp. v. United States, 45 Fed. Cl. 481, 485 (2000) (citing Dep't of Econ. Dev. v. Arthur Andersen & Co., 139 F.R.D. 295, 300 (S.D.N.Y.), recons. denied, 139 F.R.D. 594 (S.D.N.Y. 1991)). It is sometimes difficult, however, to draw a bright line between privileged attorney-client communications and communications involving business advice, which are not privileged. See Rice, Attorney-Client Privilege in the United States § 7:2, at 1108 ("Establishing that the communication to in-house counsel was generated primarily for the purpose of seeking legal advice is further complicated by the fact that virtually all internal legal communications are, to some extent, relevant to the business ends of the company."). In Energy Capital Corp. v. United States, the court indicated no privilege applies when an attorney drafts generic corporate documents, such as "'by-laws, promissory notes, security agreements, incorporation documents, partnership documents and tax information.'" Energy Capital Corp. v. United States, 45 Fed. Cl. at 485 (quoting Montgomery v. Leftwich, Moore & Douglas, 161 F.R.D. 224, 227 (D.D.C. 1995)). In Studiengesellschaft Kohle mbH v. Novamont Corp., in contrast, the court applied the privilege to an attorney's communications to a client regarding contract negotiations even though the communications included business advice, stating that the test is whether the lawyer giving advice was "functioning as an attorney." Studiengesellschaft Kohle mbH v. Novamont Corp., 1980 U.S. Dist. LEXIS 15042, at *4–6 (S.D.N.Y. Nov. 17, 1980). Despite the broad brush approach in Energy Capital, a number of authorities, including Rice and Wigmore, suggest that the characterization of advice strictly as "business" or "legal" is misleading because the relevant analysis is whether an attorney gives advice by interpreting or applying legal principles, which is consistent with the court's holding in Studiengesellschaft. See Rice, Attorney-Client Privilege in the United States § 7:10, at 1166–67 ("Fundamentally, the legal standard requires that the lawyer's services involve interpretation and application of legal principles to specific facts in order to guide future conduct. It requires an attorney to render the type of

9

services that his [or her] education and certification to practice qualify him [or her] to render for compensation. Legal assistance requires the involvement of the 'judgment of a lawyer in his capacity as a lawyer.'" (footnotes and citations omitted)); 8 Wigmore, Evidence § 2296, at 566–67 ("It is not easy to frame a definite test for distinguishing *legal from nonlegal advice*. Where the general purpose concerns legal rights and obligations, a particular incidental transaction would receive protection, though in itself it were merely commercial in nature — as where the financial condition of a shareholder is discussed in the course of a proceeding to enforce a claim against a corporation." (emphasis in original)); see also United States v. Chen, 99 F.3d at 1502 ("Calling the lawyer's advice 'legal' or 'business' advice does not help in reaching a conclusion; it *is* the conclusion." (emphasis in original)). The broad brush approach in Energy Capital appears to indicate that the privilege does not apply to an attorney's work on business matters related to a request for legal advice. The issue to be resolved on a fact by fact basis, however, is whether the attorney gave advice in his or her capacity as an attorney by interpreting or applying legal principles. Acknowledging the difficulty of "'fram[ing] a definite test for distinguishing *legal from nonlegal advice*'" the court in United States v. Chen adopted the approach advocated by Wigmore, indicating that when a client consults with an attorney with "'reference to his [or her] knowledge and discretion in the law,'" the privilege applies if the "'general purpose'" of the consultation "'concerns legal rights and obligations.'" United States v. Chen, 99 F.3d at 1501–02 (quoting 8 Wigmore, Evidence § 2296, at 566–67 (emphasis in original)). Moreover, "[i]t has been recognized . . . that in the process of giving legal advice, an attorney may incorporate . . . 'relevant nonlegal considerations' without losing the privilege of nondisclosure." United States v. Int'l Bus. Machs. Corp., 66 F.R.D. 206 (S.D.N.Y. 1974) (quoting United States v. United Shoe Mach. Corp., 89 F. Supp. 357 (D. Mass. 1950)).

In addition, although the privilege protects the substance of attorney-client communications, "it does not protect disclosure of the underlying facts by those who communicated with the attorney." Upjohn Co. v. United States, 449 U.S. at 395. Underlying facts, therefore, are independently discoverable, but the facts that a client included in a request for legal advice to assist the attorney in providing legal services are privileged in the context of an attorney-client communication. See Muro v. Target Corp., 250 F.R.D. 350, 363 (N.D. Ill. 2007), aff'd, 580 F.3d 485 (7th Cir. 2009); Kintera, Inc. v. Convio, Inc., 219 F.R.D. 503, 508–09 (S.D. Cal. 2003); see also Upjohn Co. v. United States, 449 U.S. at 395–96 ("'A fact is one thing and a communication concerning that fact is an entirely different thing.'" (quoting City of Philadelphia v. Westinghouse Elec. Corp., 205 F. Supp. 830, 831 (E.D. Pa. 1962))). A client cannot shield a document from discovery by including it in a request for legal advice. Fisher v. United States, 425 U.S. at 403–04; see also Evergreen Trading, LLC ex rel Nussdorf, 80 Fed. Cl. 122, 138 (2007). The fact that a client included a document in a request for legal advice is privileged, however, because it partially reveals the substance of the client's privileged communication to an attorney. See Alexander v. FBI, 186 F.R.D. 154, 162 (D.D.C. 1999) (holding that a document sent to a government attorney was privileged while noting the facts contained within the document were independently discoverable); Angst v. Mack Trucks, Inc., Nos. 90–3274, 90–4329, 1991 WL 86931, at *2 (E.D. Pa. May 14, 1991) (holding that notes a client transmits to an attorney are

10

ordinarily privileged, while identical notes retained by a client may not be privileged); Solomon v. Scientific Am., Inc., 125 F.R.D. 34, 36 (S.D.N.Y. 1988) (holding the privilege applied to a memorandum describing facts relating to a client's case after the client sent the memorandum to an attorney because the memorandum was "intended as the equivalent of an 'intake interview'"); see also Robinson v. Tex. Auto. Dealers Ass'n, 214 F.R.D. 432, 447 (E.D. Tex. 2003) (holding the copy a of document that an attorney transmitted to a client was privileged because the "act of sending the pre-existing document . . . constitute[d] a privileged communication"), vacated in unrelated part sub nom. In re Tex. Auto. Dealers Ass'n, No. 03–40860, 2003 WL 21911333 (5th Cir. July 25, 2003). The privilege protects the confidentiality of communications regardless of whether the information they contain is confidential, because a communication by a client with his or her attorney is generally assumed to be a request for legal advice. See Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. at 315 (noting that attorney's interpretation of statute, regulation, or contract may be privileged even though the information underlying the interpretation is public); In re Ampicillin Antitrust Litig., 81 F.R.D. 377, 388–89 (D.D.C. 1978) ("[I]t is not necessary that the information be confidential for the privilege to apply.").

Although information may be privileged as it appears in an attorney-client communication, the broad subject matter or general nature of the communication or the attorney-client relationship generally is not. See Avgoustis v. Shinseki, 639 F.3d 1340, 1344 (Fed. Cir. 2011) ("'Courts have consistently held that the general subject matters of clients' representations are not privileged.'" (quoting United States v. Legal Servs. for N.Y.C., 249 F.3d 1077, 1081 (D.C. Cir. 2001))); GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1273 (Fed. Cir. 2001) (noting while applying Fifth Circuit law that "[i]nquiry into the general nature of the legal services provided by counsel does not necessitate an assertion of the privilege because the general nature of services is not protected" (citing Nguyen v. Excel Corp., 197 F.3d 200, 206 (5th Cir. 1999)), reh'g en banc denied (Fed. Cir.), cert. denied, 537 U.S. 1046 (2002); Colton v. United States, 306 F.2d 633, 636–38 (2d Cir. 1962) (allowing inquiry into the nature of the attorney-client relationship if limited to "'general responses, such as 'litigation,' 'drafting of documents,' 'tax advice,' and the like'" for the purpose of separating legal from non-legal advice), cert. denied, 371 U.S. 951 (1963); J. P. Foley & Co. v. Vanderbilt, 65 F.R.D. 523, 526 (S.D.N.Y. 1974); see also Testwuide v. United States, 2006 WL 5625760, at *4. But see Lee Nat'l Corp. v. Deramus, 313 F. Supp. 224, 225–26 (D. Del. 1970) (indicating that questions relating to when a corporation "had consulted with counsel concerning proposed changes in the bylaws and certificate of incorporation" impermissibly targeted the substance of privileged communications). The fact of legal consultation, however, generally is not privileged because it does not directly reveal the substance of a client's request for legal advice. See Humphreys, Hutcheson, & Moseley v. Donovan, 755 F.2d 1211, 1219 (6th Cir. 1985); see also Howell v. Jones, 516 F.2d 53, 58 (5th Cir.) ("The great weight of authority . . . refuses to extend the attorney-client privilege to the fact of consultation or employment . . . ." (citing 8 Wigmore, Evidence § 2313, and McCormick, Evidence § 90 (2d ed. 1972))), reh'g denied and reh'g en banc denied, 521 F.2d 815 (5th Cir. 1975) (unpublished table decision), cert. denied, 424 U.S. 916, reh'g denied, 425 U.S. 945 (1976). The fact of legal consultation may be privileged, however, if its disclosure would

"chill the willingness of citizens to approach a lawyer's office" by indirectly revealing the substance of a privileged communication. See Am. Standard Inc. v. Pfizer Inc., 828 F.2d at 745; see also Avgoustis v. Shinseki, 639 F.3d at 1346 ("[R]equiring detailed disclosure of subject matter could conceivably implicate the attorney-client privilege in unusual circumstances . . . ."); Rice, Attorney-Client Privilege in the United States § 6:22, at 1006 ("[T]he general nature of the services performed must be identified with sufficient particularity to permit an assessment of the substantive nature of the activity, but not so specific that the substance of confidential communications are directly or indirectly revealed.").

The privilege also may extend to a client's summary of an attorney's advice. See Alexander v. FBI, 186 F.R.D. at 160–61 (applying the privilege to a government employee's date book that summarized communications from a government attorney, "which themselves incorporate[d] confidences communicated from Bernath [the employee] to his attorney"); see also Nesse v. Pittman, 206 F.R.D. 325, 329 (D.D.C. 2002) (holding partner's summary of attorney's advice to another partner was privileged because it "indirectly capture[d]" the substance of the other partner's request for legal advice). In addition, although the privilege may not extend to all actions that a client takes in response to an attorney's advice, see Stout v. Ill. Farmers Ins. Co., 150 F.R.D. 594, 611 (S.D. Ind.), aff'd, 852 F. Supp. 704 (S.D. Ind. 1994), disclosure of the fact that "the client takes that advice to heart and acts upon it" is privileged if it indirectly reveals the substance the client's request for legal advice. See SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 516–17 (D. Conn.) (prohibiting party from circumventing the privilege during a deposition by asking an executive of a corporation for his or her reasons for making a particular decision when the executive indicates that he or she made the decision in reliance on an attorney's legal advice), appeal dismissed, 534 F.2d 1031 (2d Cir. 1976).

The privilege applies to internal governmental communications if they indirectly reveal the substance of a request for legal advice. The privilege, therefore, applies to the summaries of legal advice contained in the Memorandum at issue to the extent that the summaries directly or indirectly reveal what the contracting officer or other government agents told JCCI/A Legal in connection with a request for legal advice. See Am. Standard Inc. v. Pfizer Inc., 828 F.2d at 745; Alexander v. FBI, 186 F.R.D. at 160–61.

With respect to the first passage the government seeks to redact, plaintiff contends that the summary of communications, which begin "JCCI/A Legal recommended," reflects "business advice that is not protected by attorney-client privilege." It appears that the general purpose of the advice summarized in the first passage was to interpret the contract for the contracting officer, Lt. Col. Richardson, and to address the government's contract under different scenarios. See United States v. Chen, 99 F.3d at 1502. Plaintiff is correct that the first passage reflects "financial and operational concerns." The first two sentences of the first passage reveal that JCCI/A Legal recommended [redacted]. The third sentence of the first passage indicates that the [redacted]. Although "financial and operational concerns" were also at issue, the totality of the first passage, as well as each sentence considered individually, indicate

12

that Lt. Col. Richardson requested JCCI/A Legal's advice regarding how to proceed with the contract with reference to JCCI/A Legal's "'knowledge and discretion in the law.'" See United States v. Chen, 99 F.3d at 1501 (quoting 8 Wigmore, Evidence § 2296, at 566–67). An attorney's focus during contract negotiations on achieving the most financially advantageous outcome for his or her client does not transform the attorney's communications into unprotected, business advice. See Studiengesellschaft Kohle mbH v. Novamont Corp., 1980 U.S. Dist. LEXIS 15042, at *5–6. In this case, JCCI/A Legal's recognition of financial and operational concerns does not alter the privileged status of its communications with Lt. Col. Richardson.

The fourth sentence of the first passage, although awkwardly phrased, is a legal comment on what it would take to structure an in-scope modification to the contract. The use of passive voice in the second and fourth sentences does make attribution of those sentences to counsel a bit difficult. This confusion, however, also undermines plaintiff's characterization of JCCI/A Legal's recommendations as "business advice" offered by counsel. It is not entirely clear whether the phrase "JCCI/A Legal" applies just to the first sentence of the first passage or to the whole paragraph. The first and third sentences, however, seem to wrap all the consultations and recommendations up as part of the consultations between the contracting officer, JCCI/A Legal, and other government representatives. The "'overall tenor'" of the first passage at issue, and particularly the first sentence of the passage, which sets the tone of the paragraph, seem to reflect a request for JCCI/A Legal's advice, which is what is necessary to establish the applicability of the privilege. See First Heights Bank, FSB v. United States, 46 Fed. Cl. at 315 (quoting In re Spalding Sports Worldwide, Inc., 203 F.3d at 806 (applying Federal Circuit law)).

Moreover, plaintiff's focus on the source of each assertion contained in the first passage misconstrues the purpose of the privilege. Even if Lt. Col. Richardson were to have been the source of the unattributed determinations reflected in the second and fourth sentences, to reveal that Lt. Col. Richardson made these determinations after consulting JCCI/A Legal would circumvent the protection of the privilege in the same manner as an inquiry into a client's reasons for taking an action recommended by an attorney. The first passage, in its entirety, indicates that Lt. Col. Richardson made the determinations reflected in the second and fourth sentences in direct response to JCCI/A Legal's advice. A disclosure of the contents of the first passage, therefore, risks exposing the substance of those privileged communications. See SCM Corp. v. Xerox Corp., 70 F.R.D. at 517 ("To allow a litigant to probe beyond the assertion of privilege to the substance of the legal advice because the client takes that advice to heart and acts upon it would effectively circumvent the protection of the privilege."). Taken as a whole, therefore, the first passage is privileged and may be redacted by defendant because it indirectly discloses the substance of defendant's internal requests for legal advice, and the advice received, by summarizing JCCI/A Legal's recommendations, as well as Lt. Col. Richardson's description of JCCI/A Legal's advice on how to formulate the actions taken in response to those recommendations.

The court determines, however, that the privilege does not apply to the second passage defendant seeks to redact. The section of the Memorandum that the second passage appears in is under the heading: "Statement of Objectives/Performance-Based Work Statement." The section indicates that Lt. Col. Richardson produced a Performance-Based Work Statement with, "significant consultation" with JCCI/A Legal and Oasis. The sentence defendant seeks to redact states: "This included an operating lease for the bottling facilities and associated equipment—this concept was approved by the HCA (see 10 Aug/10:58 e-mail under 'Legal Review')." Defendant's motion does not explain what makes this sentence in the second passage privileged, concluding only that "Oasis cannot seriously contest that the short redacted passages in the MFR," including the second passage at issue, "contain recitations of legal advice that meet the standard for protected attorney-client communications." The second passage's cryptic reference to "'Legal Review,'" however, reveals little more than that Lt. Col. Richardson, in consultation with JCCI/A Legal and Oasis, produced a new Performance-Based Work Statement, which included an operating lease that also was approved by the Head of the Contracting Activity. The statement does not reveal the substance of that advice, and does not even indirectly reveal the substance of any privileged communication regarding an attorney-client relationship. The cryptic reference to an email that contains the terms "under 'Legal Review'" in the second passage of the Memorandum does not disclose enough about a potential attorney-client communication to warrant an application of the privilege. See Salem Fin., Inc. v. United States, 102 Fed. Cl. at 800. There is no indication that the second passage is one of those instances in which the fact of legal consultation is privileged because it neither discloses enough information to "chill the willingness of citizens to approach a lawyer's office," nor does it reveal the substance of any underlying privileged communications. See Am. Standard Inc. v. Pfizer Inc., 828 F.2d at 745; see also Avgoustis v. Shinseki, 639 F.3d at 1346. In fact, the phrase "under 'Legal Review'" may only reflect the title of the "Aug/10:58" email referenced in the second passage. Moreover, defendant has not asked to redact the sentence immediately above the one proposed for redaction, which states: "The Contracting Officer, with significant consultation with JCCI/A Legal, and the Contractor worked together to produce a Performance-Based Work Statement (PBWS) to replace the Statement of Objectives." This sentence also makes a reference to Lt. Col. Richardson's consultation with "JCCI/A Legal," but similarly does not disclose the contents of any privileged communications. Defendant's request to redact the second passage, but not related passages, demonstrates inconsistencies in defendant's position.

The first four sentences of the third passage proposed for redaction, in the section of the Memorandum titled "CLIN Structure," are privileged because they disclose the substance of defendant's internal requests for legal advice. Defendant did not ask to redact the two sentences immediately preceding the third passage, which state with respect to the contract's CLIN structure prior to modification P00011: "This CLIN structure was not conducive to the operation of a service contract. P00011 revamped the CLIN structure to clearly reflect a bottled water capability contract (service)." The first sentence of the passage, which defendant did ask to redact, states:

"Legal Counsel [redacted]." The second, third, and fourth sentences also elaborate on "this" recommendation:

> To accomplish this, the Government and Contractor agreed to establish a priced CLIN for Bottled Water production capability with non-priced CLINs for production capability for each facility. Additionally, the Government established a new non-priced CLIN for equipment lease, [redacted].

(emphasis added). Although plaintiff is correct that these sentences do not provide a detailed legal analysis, the language used in the third passage proposed for redaction does not support plaintiff's contention that the third passage discloses only "business advice." The description that legal counsel reviewed the revised CLIN structure, and that JCCI/A Legal evaluated "legal sufficiency" when making its recommendations, demonstrate that JCCI/A Legal was consulted for its legal expertise, rather than for business or economic advice.

Although the second sentence of the third passage does not directly disclose a recommendation from legal counsel, it reveals that, "[t]o accomplish this, [that "the CLIN structure must be reflective of capability at each production capability site and inclusive of lease of equipment price,"] the Government and Contractor agreed to establish a priced CLIN for Bottled Water production capability with non-priced CLINs for production capability for each facility." This summary of actions taken in response to the recommendation in the first sentence in the passage proposed for redaction indirectly reveals the substance of that recommendation in the same manner that an inquiry into a client's reasons for taking action in reliance on attorney's advice reveals the substance of that advice. See SCM Corp. v. Xerox Corp., 70 F.R.D. at 517. As a result, the statement in the fourth sentence proposed for redaction in the third passage that, "[redacted]" is connected to and risks disclosing that "[redacted]." The first four sentences of the third passage proposed for redaction, when read together, therefore, are privileged because they directly or indirectly reveal the substance of defendant's internal requests for legal advice.

The fifth sentence of the third passage, which is located in the section of the Memorandum titled "CLIN Structure," is not privileged because it does not reveal the substance of a privileged attorney-client communication. The fifth sentence states: "The revised CLIN structure is listed as capability per plant and a water production equipment lease for each option period." The fifth sentence is no more than a description of the revised CLIN structure. Moreover, the revised CLIN structure is even more fully described on the next page of the Memorandum, which defendant has not asked to redact. The fifth sentence of the third passage defendant requests to redact, therefore, is not privileged because it reveals a readily discernible aspect of the contract, not the substance of defendant's internal requests for legal advice or the advice given.

Plaintiff misconstrues the nature of the privilege when it asserts that the third passage is not privileged merely because it contains "factual information" that has already been disclosed to plaintiff. Just as an attorney's interpretation of a statute,

regulation, or contract may be privileged, even though the information underlying the attorney's interpretation is in the public domain, the privilege may apply to defendant's internal requests for legal advice regardless of whether the information that serves as the basis for those requests is confidential. See Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. at 315; see also Cencast Servs., L.P. v. United States, 91 Fed. Cl. at 504 ("[T]hat a client communicates public information does not destroy the privilege if the circumstances surrounding the creation and dissemination of the document show that the communications were intended to be confidential."); In re Ampicillin Antitrust Litig., 81 F.R.D. at 389–90 ("It is not necessary that the information be confidential for the privilege to apply"). Although plaintiff is free to independently discover the factual information contained in the third passage, the first four sentences of the third passage defendant seeks to redact remain privileged. See Baxter Travenol Labs., Inc. v. Lemay, 89 F.R.D. 410, 415 (S.D. Ohio 1981) ("Warnick, as Plaintiffs' employee, cannot be compelled to answer the question, 'What did you say to Plaintiffs' attorney?' But Warnick may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication with Plaintiffs' attorney."); Knogo Corp. v. United States, 213 U.S.P.Q. 936, 940 (Ct. Cl. Trial Div. 1980) ("In other words, the client cannot assert the privilege if asked how the invention works, but he can assert the privilege if he is asked to recount what he told his attorney concerning how the invention works.").

The fourth passage of the Memorandum defendant requests to redact is not privileged. The passage is an endorsement at the bottom of the Memorandum, which reveals only that an attorney reviewed the Memorandum, stating: "This memo was endorsed by: Major Michael S. Martin, USAF Deputy Command Judge Advocate Joint Contracting Command – Iraq/Afghanistan *See next page.*" (emphasis in original). As plaintiff notes, defendant has not explained how an attorney's endorsement of the Memorandum reveals the substance of a request for legal advice, particularly given that Maj. Martin's name and information is not redacted on the "next page" of available copies of the Memorandum. The "next page" immediately following the attorney's endorsement, which like the previous page is numbered "12 of 12," reveals that the endorsement signifies only that the attorney "concur[red] with the foregoing summary of JA involvement with restructuring contract W27P4A-05-C-0002."[4] Defendant's actions

---

[4] In the redacted version of the Memorandum attached to defendant's motion to substitute pages in the Joint Appendix, defendant did not include a copy of the "next page," although in the unredacted version of the Memorandum that appears in the Joint Appendix, the page following the attorney's endorsement, the second "Page 12 of 12," was included, albeit in largely illegible form. The court was able to review a copy of that "next page" from the four copies of the partially redacted version of the Memorandum that plaintiff submitted to the court in response to defendant's motion, which plaintiff represented were contained previously in "the Government's production of documents to Oasis," as well as the in camera version of the Memorandum that defendant submitted to the court after the court directed the parties to submit a legible copy of the Memorandum. In the copies of the "next page" submitted by plaintiff, Maj. Martin's name, rank, and job assignment are not redacted, even though defendant seeks to redact this information from the preceding page, although a concurrence "with the

have been anything but consistent. Given the absence of a request for redactions in the most recent electronic submission to the court of the concurrence language on the additional "Page 12 of 12," and that defendant never redacted Maj. Martin's information on the four copies of the "next page" defendant produced to plaintiff during discovery, the fourth passage that defendant requests be redacted appears not to reveal anything of substance regarding the attorney-client relationship.

In summary, the court finds that the first passage and the first four sentences of the third passage of the Memorandum at issue are privileged because they represent requests for legal advice and JCCI/A Legal's responses to defendant's internal requests for legal advice. The second passage, the fifth sentence of the third passage, and the fourth passage of the Memorandum, however, are not privileged because they neither directly nor indirectly reveal the substance of a request for legal advice or the substance of the advice given. Similarly, the last page of the Memorandum, the second "Page 12 of 12," which indicates, in part, that Maj. Martin "concur[red] with the foregoing summary of JA involvement with restructuring contract W27P4A-05-C-0002," is not privileged.

Waiver of the Attorney-Client Privilege

Plaintiff alternatively contends that defendant waived the attorney-client privilege regarding the Memorandum when Benjamin Jenkins, "Oasis's primary day-to-day Government point of contact for matters related to the Contract," disclosed the document in 2007 to Anthony Painter, plaintiff's representative and an employee of plaintiff's subcontractor. In addition, plaintiff asserts that Lt. Col. Richardson's emails to Paul Jeffries, the Chief Executive Officer of plaintiff's subcontractor, resulted in a waiver of the passages in 2006 because she revealed a number of communications with legal counsel surrounding the restructuring of the contract. Plaintiff also argues that Mr. Jenkins' disclosure in 2007, in combination with Lt. Col. Richardson's revelation of privileged communications to Mr. Jeffries in 2006, effected a subject matter waiver that extends to "*all* documents related to the structure of this Contract and regarding which the Government has now asserted attorney-client privilege." (emphasis in original). Defendant argues that Mr. Jenkins' disclosure did not result in waiver because only the Secretary of the Army has the power to waive the privilege as "the Army . . . is the client of any Army attorney." Defendant, therefore, argues that Mr. Jenkins lacked authority to

foregoing summary of JA involvement with restructuring contract W27P4A-05-C-0002" is redacted. In the four copies of the partially redacted version of the Memorandum that defendant previously produced to plaintiff during discovery, defendant included redacted versions of the "next page" following the attorney's endorsement, but defendant did not make conforming redactions to the "next page" in the second, redacted version of the Memorandum that defendant filed on the court's electronic filing system on September 18, 2012 in support of defendant's earlier motion to substitute pages in the Joint Appendix. The language, "I concur with the foregoing summary of JA involvement with restructuring contract W27P4A-05-C-0002. Detailed questions concerning the legal analysis of the revised CLIN structure should be directed to my attention," on the next page, the second "Page 12 of 12," in the most recent filing with the court is not redacted and not requested for redaction by defendant.

17

waive the privilege for defendant. Even if neither Mr. Jenkins nor Lt. Col. Richardson had waived the privilege for defendant in 2006 and 2007, the court finds that defendant waived the privilege regarding certain portions of the Memorandum as a result of defendant's prior production of four copies of the partially redacted version of the Memorandum to plaintiff during the course of discovery.[5]

Doctrines pertinent to the waiver of the attorney-client privilege initially evolved in case law, followed by formalization in part in the Federal Rules of Evidence in September 2008. Prior to the addition of the 2008 waiver provision to the Federal Rules of Evidence, the United States Court of Appeals for the Federal Circuit indicated: "There is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosure." Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1349 (Fed. Cir. 2005) (noting the case-specific, fact-intensive nature of the inquiry), cert. denied, 547 U.S. 1069 (2006). "The attorney-client privilege belongs to the client, who alone may waive it." In re Seagate Tech., LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007) (citations omitted), cert. denied, 552 U.S. 1230 (2008). A client's knowing or voluntary disclosure of a privileged communication to a third party can act as "a surrender of the privilege protection." See Fort James Corp. v. Solo Cup Co., 412 F.3d at 1350; see also Carter v. Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990) (en banc), superseded in non-relevant part, Pub. L. No. 103-424, § 9(c), 108 Stat. 4361 (1994), as recognized in Mudge v. United States, 308 F.3d 1220, 1223 (Fed. Cir. 2002) (citation omitted), reh'g and reh'g en banc denied (Fed. Cir. 2003). Disclosure of a privileged communication to a client's agents, however, does not waive the privilege as long as the disclosure is necessary to further the agent's functions. See Panasonic Commc'ns Corp. of Am. v. United States, 99 Fed. Cl. 422, 427–29 (2011); see also In re Bieter Co., 16 F.3d 929, 937–38 (8th Cir.) (holding a partnership's disclosure of a communication to an independent consultant did not waive the privilege when the consultant was "the functional equivalent of an employee"), reh'g and suggestion for reh'g en banc denied (8th Cir. 1994); Renda Marine, Inc. v. United States, 62 Fed. Cl. 371, 375 (2004) (holding an agency's

---

[5] The court recognizes that the clawback agreement that the parties submitted to the court, which was largely incorporated into the Clawback Order the court entered for the case, provided:

> In connection with Documents produced by Oasis or the Government, and consistent with FRE [Federal Rule of Evidence] 502(b), the inadvertent disclosure of any Document which is subject to a legitimate claim that the Document should have been withheld as Privileged Material shall not waive any privilege for that Document or for the subject matter of the inadvertently disclosed Document in the present case or any other federal or state proceeding.

As indicated below, however, the existence of a clawback order does not prevent the court from finding in particular instances that defendant waived the privilege during the course of discovery.

disclosure of a privileged communication to government agents "does not alter the privileged status of the communication").

In the corporate context, the power to waive the privilege "rests with the corporation's management and is normally exercised by its officers and directors." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985). This is because "[s]tate corporation laws generally vest management authority in a corporation's board of directors . . . [and] [t]he authority of officers derives legally from that of the board of directors." Id. at 348 n.4; see also Alexander v. FBI, 198 F.R.D. 306, 315 (D.D.C. 2000) (noting that a lower-level employee's disclosure of a privileged corporate communication does not waive the privilege, but cautioning that corporate counsel's authorization of a lower-level employee to speak for the corporation on the subject matter of a privileged communication may give the employee power to waive the privilege); Jonathan Corp. v. Prime Computer, Inc., 114 F.R.D. 693, 698–700 (E.D. Va. 1987) ("Logically, a corporation cannot enjoy the benefits of an expanded attorney-client privilege without likewise accepting the consequences that the privilege may well be waived by an employee who is outside of the 'control group.'").

Although the contours of government waiver are not as clearly established, the same logic has been applied to allow local government agents to waive the privilege if they have been delegated authority to bind the government with respect to particular subject matter. See Interfaith Hous. Del., Inc. v. Town of Georgetown, 841 F. Supp. 1393, 1399–1400 (D. Del. 1994) (holding a member of a town council did not have authority to waive the privilege because a council member is unlike the mayor of a city or the president of a corporation, who have "clear leadership positions which give them authority to bind their respective principals" and, accordingly, waive the privilege). As one commentator has noted:

> Consistent with defining who personifies a governmental client under the attorney-client privilege, courts follow corporate precedence to determine who has the authority to waive the government's privilege protection. In following that line of cases, however, some courts appear to have treated individuals within the governmental hierarchy different from those with comparable positions in the corporate world, relative to the power to waive the government's privilege protection. . . . [A]gents in both the private and governmental contexts should be held to have the power to destroy the privilege of the entity entrusted to them, and thereby waive the privilege based on that confidentiality.

Rice, Attorney-Client Privilege in the United States § 9:20, at 64–65 (footnotes omitted). "'Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.'" H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir.) (alterations in original) (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982)), amended on reh'g (Fed. Cir. 1989); see also Powers v. Chi. Transit Auth., 890 F.2d 1355, 1359, 1359 n.2 (7th Cir. 1989) (considering the nature of a government agent's position in

determining whether the agent had authority to waive the protection of the attorney-client privilege); Zoubi v. United States, 25 Cl. Ct. 581, 587 (1992) ("[A] procuring agency's CO [contracting officer] is not the only person capable of binding the agency in contract . . . . [T]he nature of the duties assigned to Ruth [an employee] must be examined to determine whether Ruth had the implied authority to bind the CS [the agency] . . . ." (citations omitted)). In finding implied authority, however, "there must be, at the least, some limited, related authority upon which the court can 'administer' the law so as not to ignore the policies and decisions of those persons charged with managing government programs." Cal. Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 27 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991) (unpublished table decision), cert. denied, 502 U.S. 1057 (1992).

If a person with authority to waive the privilege intentionally discloses a privileged communication, that person waives the privilege with respect to the communication. See First Heights Bank, FSB v. United States, 46 Fed. Cl. at 319. Loss of the privilege can also result if a party produces a document without taking adequate precautions against the document's inadvertent disclosure. See Fort James Corp. v. Solo Cup Co., 412 F.3d at 1350 (holding a party waived the privilege with respect to documents produced in response to a request for documents related to previously partially disclosed attorney-client communications because the party should have known to redact information that had not been waived in its previous disclosure); see also Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 500, 507, 510 (holding that disclosure of a privileged document waived the work product protection because it "was so careless that it cannot be construed as inadvertent," and the disclosing party did not promptly take reasonable steps to fix the error). Intent to disclose may also be implied if the disclosing party fails to object to the receiving party's use of a privileged document during litigation. See Church of Universal Love & Music v. Fayette Cnty., No. 06–872, 2009 WL 159272, at *1 (W.D. Pa. Jan. 22, 2009) (holding a party waived the privilege over a document that the defendant's former attorney independently sent to the plaintiff by not objecting to the plaintiff's use of the document during a deposition or the plaintiff's attachment of the document to pleadings filed with the court), recons. denied, 2009 WL 331549 (W.D. Pa. Feb. 11, 2009); F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A., 184 F.R.D. 64, 67–68, 74 (D. Md. 1998) (rejecting a party's claim of inadvertent disclosure even though the party produced a two-page privileged memorandum in a production of documents involving more than 64,000 pages because the producing party neither objected to the opposing party's use of the memorandum at a deposition, nor sought return of the memorandum pursuant to a protective order that entitled the producing party to retrieve the memorandum).

However, "[t]here is no per se rule that a waiver must be found in all situations where there is a mistaken or inadvertent production of a privileged document." Telephonics Corp. v. United States, 32 Fed. Cl. 360, 361 (1994). The courts have considered a number of factors in analyzing an inadvertent disclosure, including (1) whether the disclosing party took precautions to prevent the disclosure, such as the use of protective markings, (2) the amount of time taken for the disclosing party to remedy its error, (3) the scope of discovery, (4) the extent of the disclosure, and (5) fairness to

20

the parties.  See id. at 361–62 (citations omitted).  As noted above, in September 2008, Rule 502(b) of the Federal Rules of Evidence established a waiver rule that denies waiver as a result of the disclosure of a privileged communication specifically "made in a federal proceeding or to a federal office or agency" if:

> **(1)** the disclosure is inadvertent;
>
> **(2)** the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>
> **(3)** the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).[6]

Fed. R. Evid. 502(b) (2013);[7] accord Nat'l Helium Corp. v. United States, 219 Ct. Cl. 612, 616 (1979); see also Sikorsky Aircraft Corp. v. United States, 106 Fed. Cl. 571,

---

[6] Federal Rule of Civil Procedure 26(b)(5)(B) provides:

> *Information Produced.*  If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim.  The producing party must preserve the information until the claim is resolved.

Fed. R. Civ. P. 26(b)(5)(B) (2013) (emphasis in original).

[7] Federal Rules of Evidence 502(a) and 502(b) state in full:

> The following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the attorney-client privilege or work-product protection:
>
> **(a) Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver.**  When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> > **(1)** the waiver is intentional;
> >
> > **(2)** the disclosed and undisclosed communications or information concern the same subject matter; and

21

584 (2012) (discussing the relationship between Rule 502(b) and previous, court-created tests for waiver).

Telephonics Corp. v. United States, 32 Fed. Cl. 360, is illustrative of the analysis that court's apply to inadvertent disclosures. In Telephonics Corp. v. United States, in response to the defendant's request for production, the plaintiff allowed the defendant to inspect "30 boxes of documents, comprising tens of thousands of pages." Id. at 360. The plaintiff reviewed the documents for two days, finding and removing two copies of a privileged document before allowing the defendant to inspect the remaining documents. Id. at 361. The plaintiff, however, inadvertently, failed to remove a third copy of the same privileged document. Id. The defendant requested a copy of the document, ignoring its protective markings. Id. Upon receiving the defendant's request, the plaintiff notified the defendant of the plaintiff's error and withheld production of the document. Id. Based on the specific facts of the case, the court found that the steps taken to prevent inadvertent disclosure were "reasonable and careful" enough to warrant the plaintiff's retention of the privilege. Id.; see also Int'l Bus. Machs. Corp. v. United States, 37 Fed. Cl. 599, 603 (1997) (stating the test, as the test articulated in National Helium Corp. v. United States, 219 Ct. Cl. 612 (1979): "[P]laintiff must prove that it did not intend to disclose the privileged documents" and must demonstrate "the adequacy of the screening mechanisms employed by plaintiff to prevent disclosure of the privileged documents."); cf. Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 519–20 ("[D]efendant has failed to meet its burden to demonstrate that it has not waived the attorney-client privilege . . . . Defendant failed to provide the court with sufficient information to evaluate its screening procedures for preventing disclosure. Indeed, the multiple disclosures of some of the documents suggest that defendant's screening procedures were inadequate."). The failure to object to an opposing party's use of an inadvertently produced document also has been viewed as a waiver of the related work product protection. See Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 510–11 (holding a party's failure to object to the use of an inadvertently produced document at

---

**(3)** they ought in fairness to be considered together.

**(b) Inadvertent Disclosure.** When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:

**(1)** the disclosure is inadvertent;

**(2)** the holder of the privilege or protection took reasonable steps to prevent disclosure; and

**(3)** the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(a), (b) (emphasis in original).

22

depositions, and failure to seek return of the document after the depositions, constituted a waiver of the work product protection).

If a court determines that a party has waived the privilege with respect to a particular communication, that waiver generally extends to all communications "relating to the same subject matter." Fort James Corp. v. Solo Cup Co., 412 F.3d at 1349. Subject matter waiver may occur even if the parties to separate communications that concern the same subject matter are different. See In re EchoStar Commc'ns Corp., 448 F.3d 1294, 1299 (Fed. Cir.) (extending waiver of the privilege with respect to communications with in-house counsel to communications with outside counsel on the same subject matter), cert. denied, 549 U.S. 1096 (2006). The rule is designed to prevent the "selective waiver of the privilege," which "may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice," thereby using the privilege "as both a sword and a shield." Id. at 1301 (citing XYZ Corp. v. United States, 348 F.3d 16, 24 (1st Cir. 2003)). As the rule "is grounded in principles of fairness," In re Seagate Tech., LLC, 497 F.3d at 1372, courts consider a number of factors to determine the scope of a subject matter waiver, including "the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." See Fort James Corp. v. Solo Cup Co., 412 F.3d at 1349–50.

In Fort James Corp. v. Solo Cup Co., the United States Court of Appeals for the Federal Circuit considered whether a series of intentional disclosures of privileged communications effected a subject matter waiver. Id. at 1344, 1349. The Federal Circuit stated: "The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter." Id. at 1349. The Federal Circuit then cited Weil v. Inv./Indicators, Research & Mgmt., Inc., 647 F.2d 18 (9th Cir. 1981), a case which involved an inadvertent disclosure, when the Federal Circuit discussed the principles of fairness underpinning subject matter waivers. Fort James Corp. v. Solo Cup. Co., 412 F.3d at 1349. The comments to Federal Rule of Evidence 502(a), which limits the scope of subject matter waivers to intentional waivers, clarify that, because Rule 502(a) "is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner[,] [i]t follows that an inadvertent disclosure of protected information can never result in a subject matter waiver." Fed. R. Evid. 502(a), note; see also Potomac Elec. Power Co. & Subsidiaries v. United States, 107 Fed. Cl. 725, 730 (2012) ("FRE 502(a) provides that a disclosure will result in a subject matter waiver *only* when (1) the waiver is 'intentional,' . . . ." (emphasis in original)). "The rule rejects the result in In re Sealed Case, 877 F.2d 976 (D.C. Cir. 1989), which held that inadvertent disclosure of documents during discovery automatically constituted a subject matter waiver." Fed. R. Evid. 502(a), note.

As the Federal Circuit has since recognized with respect to the fairness considerations established in Federal Rule of Evidence 502(a), however, it is unresolved whether "Rule 502(a) governs the scope of waiver resulting from . . . prelitigation disclosure." See Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP, 684

23

F.3d 1364, 1369 (Fed. Cir. 2012) (applying Ninth Circuit law).  By its terms, Rule 502(a) applies "[w]hen the disclosure is made in a federal proceeding or to a federal office or agency."  Fed. R. Evid. 502(a).  Although not crucial to the ultimate resolution of the motion currently before the court, it appears that subject matter waiver may continue to apply to inadvertent disclosures that occur prior to litigation, albeit in unusual circumstances.  See Blue Lake Forest Prods., Inc. v. United States, 75 Fed. Cl. 779, 798 (2007) (citing Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Grp., Inc., 116 F.R.D. 46, 52 (M.D.N.C. 1987) ("The general rule that a disclosure waives not only the specific communication but also the subject matter of it in other communications is not appropriate in the case of inadvertent disclosure, unless it is obvious a party is attempting to gain an advantage or make offensive or unfair use of the disclosure." (emphasis added) (citations omitted))); see also Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. at 316 (noting that "subject matter waiver is inapplicable where the disclosure was not made in the context of a judicial proceeding and did not afford the client an adversarial gain," but concluding that subject matter waiver was inapplicable to the particular, inadvertent disclosure at issue, which had occurred outside the context of litigation, "because plaintiffs have failed to demonstrate any prejudice or tactical advantage" (citing In re von Bulow, 828 F.2d 94, 102 (2d Cir. 1987)).  But see Evergreen Trading, LLC ex rel Nussdorf, 80 Fed. Cl. at 129, 129 n.9 (suggesting that subject matter waiver may not apply to disclosures outside the context of litigation).

That subject matter waiver may apply to inadvertent disclosures occurring prior to litigation is consistent with the purpose of Rule 502(a) to address "the widespread complaint that litigation costs necessary to protect against waiver of attorney-client privilege or work product have become prohibitive due to the concern that any disclosure (however innocent or minimal) will operate as a subject matter waiver of all protected communications or information," which "is especially troubling in cases involving electronic discovery."  See Fed. R. Evid. 502(a), note; see also Mt. Hawley Ins. Co. v. Felman Prod., Inc., 271 F.R.D. 125, 134 (S.D. W. Va.) (noting that the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States indicated in a letter to the Committees on the Judiciary of the United States Senate and House of Representatives, identifying the problems addressed by FRE 502, that "'Advisory Committee members . . . expressed the view that the fear of waiver leads to extravagant claims of privilege.  Members concluded that if there were a way to produce documents in discovery without risking subject matter waiver, the discovery process could be made much less expensive.'"), objections overruled by No. 3:09–0481, 2010 WL 2944777 (S.D. W. Va. July 23, 2010); Silverstein v. Fed. Bureau of Prisons, No. 07-cv-02471-PAB-KMT, 2009 WL 4949959, at *9 (D. Colo. Dec. 14, 2009) ("Fed. R. Evid. 502 was enacted on September 19, 2008, to address the rising costs of litigation necessary to protect against waiver of attorney-client and work product privileges by inadvertent disclosure . . . ."), stay granted by 2009 WL 5217977 (D. Colo. Dec. 29, 2009).

If a waiver occurs in the context of litigation, however, Federal Rule of Evidence 502(a) expressly denies extension of the waiver to undisclosed communications unless "**(1)** the waiver is intentional; **(2)** the disclosed and undisclosed communications or

information concern the same subject matter; and **(3)** they ought in fairness to be considered together."  Fed. R. Evid. 502(a) (emphasis in original).

Although defendant now contends that, in the case before the court, only the Secretary of the Army has the power to waive the privilege for the government, defendant does not cite to a legal basis in support of this position.  Defendant also fails to discuss that the authority to waive the privilege has been recognized as delegable to an agent in the corporate context, which can be analogized to the government context for the purpose of analyzing waiver of the attorney-client privilege.  Just as a corporate officer's authorization of an employee to speak on a matter may empower the employee to waive the privilege for a corporation, see Alexander v. FBI, 198 F.R.D. at 315, some courts have suggested, at least with respect to local governments, that the nature of a government agent's position may indicate that the agent has authority to bind his or her principal when the agent acts within the scope of his or her authority.  See Powers v. Chi. Transit Auth., 890 F.2d at 1359, 1359 n.2 (indicating that a "'high-ranking'" Chicago Transit Authority employee may have the authority to waive the privilege on behalf of the Chicago Transit Authority); Interfaith Hous. Del., Inc. v. Town of Georgetown, 841 F. Supp. at 1399 (indicating that the mayor of a city, like a corporate president, "can effect a waiver of the city's attorney-client privilege."  (citations omitted)).

In the case currently before the court, the issue is whether Benjamin Jenkins, as a contractor, contract specialist, had the authority, either express by direction of his superior, or implied by the nature of his position, to waive the privilege for the government in 2007 when he disclosed the Memorandum to Anthony Painter, an employee of plaintiff's labor and equipment subcontractor, Al-Morrell.  See Lublin Corp. v. United States, 98 Fed. Cl. 53, 56–57 (2011) (noting that government employees other than contracting officers may have "implied actual authority" to contractually bind the government).

In order to determine whether Mr. Jenkins was delegated sufficient authority to waive the attorney-client privilege, the court first addresses whether contracting officers have been delegated sufficient authority under applicable regulations to waive the privilege in the context of their administration of a government contract.  Defendant's contention that only the Secretary of the Army has the authority to waive the privilege on behalf of the Army is not consistent with a myriad of delegable authorities from a Cabinet Secretary or a Secretary of a military service branch to those who work for them.  Defendant's position is also not consistent with the United States Supreme Court's recognition in the corporate context that the attorney-client privilege applies to requests for legal advice by individuals in the organization other than a corporation's primary principals, see Upjohn Co. v. United States, 449 U.S. at 391 ("Middle-level— and indeed lower-level—employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties . . . .  The control group test adopted by the court below thus frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation."), as well as the Supreme Court's suggestion that those employees with derivative authority to manage a

corporation's affairs may have the power to waive the corporation's privilege. See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. at 348 n.4; see also Jonathan Corp. v. Prime Computer, Inc., 114 F.R.D. at 698–700 ("Logically, a corporation cannot enjoy the benefits of an expanded attorney-client privilege without likewise accepting the consequences that the privilege may well be waived by an employee who is outside of the 'control group.'").

Defendant's over-generalized position that only the Secretary of the Army can cause a waiver also is inconsistent with the recognized principles relating to the authority of contracting officers to bind the government. Contracting officers with warrants have been afforded considerable discretion to act on behalf of the government. See DIRECTV Grp., Inc. v. United States, 670 F.3d 1370, 1385 n.5 (Fed. Cir. 2012) (Gajarsa, J. dissenting) ("[W]e have long-recognized that—absent a clear statutory or regulatory limit to their authority—contracting officers have broad discretion in the administration of contracts under their supervision." (citations omitted)); PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010) ("Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001))); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004) ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions . . . ." (citations omitted)). Moreover, during contract formation, contracting officers, who make the final award of contracts, have the authority to disclose or authorize the disclosure of procurement sensitive information pursuant to agency regulations. See 48 C.F.R. § 3.104–4 (2012). In addition, Army regulations designate contracting officers as the recipients of requests for procurement information under the Freedom of Information Act, 5 U.S.C. § 552 (Supp. III 2009), Army. Reg. 25–55 app. B(2)(b)(8) (1997), responses to which one judge of the United States Court of Federal Claims has previously indicated can effectuate a waiver of the privilege. See Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 500–01. In sum, contracting officers have the authority to bind the government in its contractual relationships, enter into contracts, modify contracts, administer contracts, which includes the provision of information to third parties, and ensure that contractors comply with a contract's terms. See Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007); 48 C.F.R. § 1.602–2 (2012) ("Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships. . . . [C]ontracting officers should be allowed wide latitude to exercise business judgment."); cf. Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1261 (Fed. Cir. 2005) ("The contracting officer is thus the authorized face of the government at the contract formation table."). As a result of this authority, contracting officers are in a position to bind their respective agencies in matters relating to the award, alteration, and administration of government contracts. See Tuftco Corp. v. United States, 222 Ct. Cl. 277, 286–88, 614 F.2d 740, 745–46 (1980) (holding that a contracting officer, "as the Government's representative," had authority to recognize an assignment in violation of the Anti-Assignment Act). Therefore, due to the nature of the position they hold,

contracting officers have implied, if not express, authority to waive the privilege over communications relating to the award and administration of government contracts because the disclosure of information relating to a government contract is an "integral part" of a contracting officer's duties. See H. Landau & Co. v. United States, 886 F.2d at 324 (internal quotations omitted).

In contrast, contract specialists, project managers, and contractor personnel may not have sufficient delegated authority to act for the government's contracting officer and waive the privilege. Contract specialists, for example, typically do not have the power to bind the government in its contractual relations. See Contract Servs., Inc. v. United States, 104 Fed. Cl. 261, 277 (2012) (determining that a contractor's reliance on a contract specialist's advice was unreasonable due to the specialist's lack of authority similar to that of a contracting officer); NASCENT Grp., J.V. ex rel. Native Am. Servs. Corp. v. United States, 103 Fed. Cl. 338, 355–56 (2012) (contrasting a project manager's authority to that of a contracting officer in determining that a project manager had no authority to bind the government). In some authorized circumstances, however, contracting officers may delegate their authority to other designated government representatives. See Winter v. Cath-dr/Balti Joint Venture, 497 F.3d at 1344.[8] An analysis of whether these representatives have the ability to bind the government (or waive the privilege) involves a factually intensive inquiry. See, e.g., NASCENT Grp., J.V. ex rel. Native Am. Servs. Corp. v. United States, 103 Fed. Cl. at 355–56.

Although Mr. Jenkins was not assigned to the contract when Lt. Col. Richardson drafted the Memorandum, Mr. Jenkins worked under contracting officer, CDR Kenneth Broomer, Lt. Col. Richardson's successor, at the time Mr. Jenkins apparently disclosed the Memorandum to Mr. Painter in 2007. At his July 18, 2012 deposition, when asked what his job title was, Mr. Jenkins responded: "I was -- I think CACI called us acquisition specialists. But I -- I was an acquisition specialist." The contract that hired CACI indicated the contract was for "four Contract Specialists, and one System Administrator." In his deposition testimony, Mr. Jenkins stated that his role involved drafting documents for CDR Broomer to sign, conducting due diligence for the Army's exercise of an option under the contract, and providing general support for CDR Broomer's administration of the contract. Mr. Jenkins further stated that he only accessed the Memorandum while conducting due diligence for CDR Broomer, and that he had no authority to create documents like the Memorandum without CDR Broomer's approval. CDR Broomer stated, in a 2012 unsworn declaration under penalty of perjury, that Mr. Jenkins' role included providing "clerical support to the contracting office, compiling contract documents, producing first drafts of memoranda, and producing contractor authorization letters to allow contractor employees on base." CDR Broomer also asserted that "Mr. Jenkins did not have authority to disclose the attached memoranda outside the contracting office at JCC-I." Both Mr. Jenkins and CDR Broomer appear to have believed that Mr. Jenkins' authority to speak or act on behalf of the government was limited, including with respect to the Memorandum. Mr. Jenkins

---

[8] In Winter v. Cath-dr/Balti Joint Venture, authority to act under the contract had been expressly reserved in the contract to the contracting officer on the matters at issue. See Winter v. Cath-dr/Balti Joint Venture, 497 F.3d at 1345–46.

held a support role to CDR Broomer, whose responsibility it was to administer the contract. Mr. Jenkins did not have sufficient authority to waive the privilege on behalf of the government.

That Mr. Jenkins lacked of authority to waive the privilege is further demonstrated by his status as a government consultant. Applicable regulations specifically prohibit contractors from performing inherently governmental functions, which include awarding contracts, approving contractual documents, administering contracts, terminating contracts, and approving agency responses to requests under the Freedom of Information Act, "other than routine responses that, because of statute, regulation, or agency policy, do not require the exercise of judgment in determining whether documents are to be released or withheld." See 48 C.F.R. §§ 7.503(a), (c)(12)–(13) (2012).[9]

The contract under which Mr. Jenkins provided support services to the Army describes his role in language that suggests a general lack of authority to bind the government, using terms such as "[r]eview," "[c]onsider," "discuss," "[a]nalyze," "make recommendations," "propose," and "assist." Defendant also notes that the contract under which Mr. Jenkins provided services specifically incorporated a provision that prohibited Mr. Jenkins from "releas[ing] to anyone outside the Contractor's organization any unclassified information, regardless of medium (e.g., film, tape, document), pertaining to any part of this contract or any program related to this contract," unless Mr. Jenkins obtained CDR Broomer's written approval or the information was already in the public domain. See 48 C.F.R. § 252.204–7000(a) (2004). As a result, disclosure of internal communications relating to the contract without CDR Broomer's approval could not be said to be within the scope of Mr. Jenkins' authority or an "integral part" of Mr. Jenkins' role when he turned over the Memorandum to Mr. Painter in 2007. See H. Landau & Co. v. United States, 886 F.2d at 324; see also Interfaith Hous. Del., Inc. v. Town of Georgetown, 841 F. Supp. at 1399–1400.

Plaintiff, however, contends that Mr. Jenkins "held a role similar to project manager," and quotes from Ralph L. Jones Co. v. United States, 33 Fed. Cl. 327 (1995), arguing: "although Mr. Jenkins is not a high-level director of the Army, this Court has previously found disclosure of a document by a 'Project Manager' to be sufficient to destroy a privilege." (quoting Ralph L. Jones Co. v. United States, 33 Fed. Cl. at 335 n.7). In Ralph L. Jones Co. v. United States, however, the defendant asserted the privilege over a document that the plaintiff in that case alleged was obtained prior to litigation from a project manager at the United States Department of Housing and Urban Development (HUD). Id. at 335 n.7. The defendant claimed the document was

---

[9] Although the regulation at 48 C.F.R. § 7.503(d)(13) cautions that "[c]ontractors participating in any situation where it might be assumed that they are agency employees or representatives" are "generally not considered to be inherently governmental functions," the introduction to Subsection (d) also states that services and actions "may approach being in that category because of the nature of the function, the manner in which the contractor performs the contract, or the manner in which the Government administers contractor performance." See 48 C.F.R. § 7.503(d).

28

privileged even though it contained a summary of a contracting officer's "factual conclusions" because the contracting officer included the document in a request for legal advice. Id. The Ralph L. Jones court determined that the privilege did not apply because there was "no reason to believe that Jones received this document in any manner other than by voluntary production from HUD." Id. The conclusion in Ralph L. Jones, that the privilege did not apply because there was no evidence to suggest that HUD objected to the document's disclosure, however, does not address the authority to waive the privilege of the individual who made the disclosure. Id. Even assuming that the project manager in Ralph L. Jones and Mr. Jenkins had similar authority, plaintiff takes a leap between the court's determination in Ralph L. Jones that HUD did not object to an allegedly privileged document's disclosure and plaintiff's conclusion that the project manager and, as a result, a contract specialist like Mr. Jenkins, had authority to waive the privilege as a result of the nature of their respective positions.

The circumstances of the present case are distinguishable from the facts presented in Ralph L. Jones. In contrast to HUD's apparent failure to object to the disclosure in Ralph L. Jones, CDR Broomer has stated under penalty of perjury that he was unaware of Mr. Jenkins' disclosure until September 4, 2012, and that Mr. Jenkins had no authority to disclose to plaintiff what CDR Broomer described during the course of litigation on defendant's motion as "highly procurement sensitive" information. In the case currently before the court, Mr. Painter indicated in his deposition that there were no protective markings on the envelope and that Mr. Painter did not recall "seeing or thinking" that Mr. Jenkins was attempting to conceal his actions because other people were in the room. Internal email communications between employees of plaintiff's subcontractor, Al-Morrell, which occurred after Mr. Jenkins had handed Mr. Painter the envelope containing the Memorandum, reveal a concern that the disclosure of the Memorandum "could cost our contact his job," that plaintiff's contact "did not want his name on an a email," and that Mr. Jenkins' alleged delivery of the Memorandum by hand was unusual. Additionally, unlike the circumstances presented in Ralph L. Jones, the circumstances of the case presently before the court suggest that defendant probably would not have consented to full disclosure of the Memorandum, and certainly does not do so now. When Mr. Jenkins gave a copy of the Memorandum to Mr. Painter in an envelope, the former told the latter to "'open it [the envelope] back at your office.'" Therefore, Mr. Jenkins as a contract specialist without express or implied authority did not have authority to waive the attorney-client privilege on behalf of the United States.[10]

In contrast to Mr. Jenkins, however, Lt. Col. Richardson was in a position to waive the privilege for defendant when she disclosed the substance of confidential attorney-client communications to Mr. Jeffries, the Chief Executive Officer of Al-Morrell, in 2006. Although defendant has not sought to assert the privilege over these communications, plaintiff has requested that the court determine that "the Government's actions in 2006 and 2007 constitute a complete subject matter waiver" of the privilege,

---

[10] Having found that Mr. Jenkins lacked authority to waive the privilege for defendant, the court does not address defendant's assertion that there was evidence of "betrayal or connivance," and, therefore, a waiver should not apply.

which has the potential to extend the disclosure of communications in 2006 to the contents of the Memorandum.

The subject matter of Lt. Col. Richardson's disclosure to Mr. Jeffries may overlap generally with the subject matter raised in the second or third passages that defendant seeks to redact from the Memorandum. In a series of emails, Lt. Col. Richardson describes counsel's proposal for restructuring the contract as a lease. Lt. Col. Richardson also describes counsel's motivation for the proposal, as well as her disagreement with counsel's recommendations regarding the use of a lease. In one of the emails, Lt. Col. Richardson indicates that she was "fighting the 'lease' idea with the lawyers." Although the references in the second passage that defendant seeks to redact to "10 Aug/10:58 e-mail under 'Legal Review'" and "an operating lease" may concern the same subject matter as Lt. Col. Richardson's communications with Mr. Jeffries, subject matter waiver does not apply to the second passage because the second passage is not privileged.

With respect to the third passage, although the court has found part of the passage privileged, other than general references to financial concerns, and concerns about using a lease, the subject matter of the 2006 emails by Lt. Col. Richardson does not overlap with the subject matter of the third passage. Moreover, even if the court broadly interpreted the scope of subject matter waiver, Lt. Col. Richardson's disclosure of privileged communications in 2006 would not result in a waiver of the privilege with respect to the contents of the Memorandum because Lt. Col. Richardson's disclosure took place outside the context of the litigation and was not motivated by a desire to obtain a tactical advantage over plaintiff. Fairness dictates that subject matter waiver applies to disclosures made for a tactical advantage, typically in the course of litigation. See In re EchoStar Commc'ns Corp., 448 F.3d at 1301 ("[S]elective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice. . . . In such a case, the party uses the attorney-client privilege as both a sword and a shield. . . . To prevent such abuses, we recognize that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter." (citations omitted)); Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. at 316 ("However, subject matter waiver is inapplicable where the disclosure was not made in the context of a judicial proceeding and did not afford the client an adversarial gain."). Plaintiff has not explained how Lt. Col. Richardson's minimal disclosure of areas of privileged communications in 2006 could afford defendant a tactical advantage over plaintiff in the pending litigation, which was filed late in 2010. Although Fort James Corp., 412 F.3d at 1349, establishes the general rule that waiver can extend to communications "relating to the same subject matter," Federal Rule of Evidence 502(a) precludes the extension of waiver to undisclosed communications unless the disclosed and undisclosed communications "ought in fairness to be considered together." Fed. R. Evid. 502(a)(3). As indicated above, Federal Rule of Evidence 502(a) by its terms expressly applies "[w]hen the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege." Fed. R. Evid. 502(a). The court appreciates,

however, "the heavy weight of current authority that comes down on the side of employing fairness considerations to decide the scope of waivers," and, therefore, applies fairness considerations that parallel those of Federal Rule of Evidence 502(a) to determine the scope of Lt. Col. Richardson's disclosure of privileged communications before the start of this litigation. See Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP, 684 F.3d at 1369, 1373 (predicting Ninth Circuit law would likely follow "the heavy weight of current authority" that requires a consideration of fairness, similar to that of Rule 502(a), when analyzing the scope of waiver that occurs outside the context of litigation); see also Fort James Corp. v. Solo Cup Co., 412 F.3d at 1349.

The tone of Lt. Col. Richardson's disclosures indicate that she revealed privileged communications to Paul Jeffries of Al-Morrell for non-adversarial reasons, thereby benefitting, rather than harming plaintiff. In fact, Lt. Col. Richardson promised: "As I get more info as to where they [JCCI/A Legal] want to go, I will forward." She reassured Mr. Jeffries, with reference to the modification of the contract, that "[t]his will not change anything in how the contract operates . . . ." Lt. Col. Richardson even commiserated with Mr. Jeffries over the modification, indicating "logistically it will be a pain for us." In addition, Lt. Col. Richardson's disclosure was limited. Although she offered to give future information on the direction the contract might take, she did not suggest that she would reveal privileged communications. Lt. Col. Richardson's disclosure of attorney-client communications in 2006, therefore, did not result in a subject matter waiver because plaintiff has not demonstrated that Lt. Col. Richardson's disclosures gave defendant a tactical advantage and fairness does not dictate that Lt. Col. Richardson's rather benign statements, which did not reveal much, "ought in fairness to be considered together" with the contents of the Memorandum. See Fed. R. Evid. 502(a).

In contrast to Lt. Col. Richardson's disclosures, defendant's previous disclosures of four copies of the partially redacted version of the Memorandum to plaintiff during discovery implicate a waiver of the privilege.[11] In all four copies previously disclosed to plaintiff, defendant did not redact the second sentence of the third passage, or portions of the first and third sentences of the third passage.[12] Although defendant redacted

---

[11] Defendant also carelessly disclosed the Memorandum in unredacted form when defendant filed the Joint Appendix with plaintiff on August 21, 2012, which defendant should have carefully reviewed before filing with the court. See Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 510 (This oversight "was so careless that it cannot be construed as inadvertent."). The parties, however, had agreed that, "by filing the Joint Appendix, neither party waives any objection to any document contained within the Joint Appendix." See Dowd v. Calabrese, 101 F.R.D. 427, 439 (D.D.C. 1984) (refraining from finding waiver as a result of disclosures made during deposition testimony when parties previously agreed that privileged communications revealed in the testimony would not constitute a waiver of the privilege).

[12] In the four copies of the partially redacted version of the Memorandum that defendant previously disclosed to plaintiff, defendant also failed to redact: "This included an operating lease for the bottling facilities and associated equipment—" from the second

31

specific references to advice from JCCI/A Legal in these copies, defendant left unredacted the first sentence of the third passage's reference to "Legal Counsel," as well as the description in the second sentence of the third passage, and part of the third sentence of the third passage, of actions taken in response to JCCI/A Legal's advice: "To accomplish this, the Government and Contractor agreed to establish a priced CLIN for Bottled Water production capability with non-priced CLINs for production capability for each facility. Additionally, the Government established a new non-priced CLIN for equipment lease . . . ." Defendant's failure to redact portions of the Memorandum from the four copies of the partially redacted version of the Memorandum produced to plaintiff during discovery can imply that the defendant, the disclosing party, intentionally disclosed the privileged communications. See Fort James Corp. v. Solo Cup Co., 412 F.3d at 1350; Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 510. In addition, F.C. Cycles indicates that defendant's intent to disclose may be further implied from its failure to seek return of the partially redacted version of the Memorandum that it produced to plaintiff pursuant to the Clawback Order that the court entered at the request of the parties. See F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A., 184 F.R.D. at 74. In the instant case, the court, accordingly, determines that defendant has waived the privilege with respect to the reference to "Legal Counsel" in the first sentence of the third passage, all of the second sentence of the third passage, as well as the disclosed portion of the third sentence of the third passage because defendant's intent to voluntarily produce the Memorandum in only partially redacted form to plaintiff during discovery is implied. See Fort James Corp. v. Solo Cup Co., 412 F.3d at 1350 ("A party's failure to protect its privilege can result in the loss of that privilege." (citation omitted)).

To the extent that defendant would argue that disclosure of the Memorandum to plaintiff in partially redacted form was inadvertent, rather than intentional, defendant does not appear to have taken "reasonable steps to prevent disclosure" or "reasonable steps to rectify the error" to warrant an application of Federal Rule of Evidence 502(b)'s prohibition on waiver in the context of inadvertent disclosures. See Fed. R. Evid. 502(b). Defendant's production of four copies of the partially redacted version of the Memorandum to plaintiff after examining the Memorandum for privileged information and applying only some redactions to the document suggests that defendant took inadequate precautions against disclosure. See Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 520. The circumstances of defendant's disclosure are not similar to those of Telephonics Corp. v. United States, in that defendant did not inadvertently produce an unredacted copy of the Memorandum to plaintiff after establishing that its contents were privileged. See Telephonics Corp. v. United States, 32 Fed. Cl. at 361. Instead, defendant produced four copies of the Memorandum to plaintiff with redactions that defendant continues to assert are consistent with its claim of privilege. Even if the court were to find that defendant's disclosure of four copies of the partially redacted version of the Memorandum to plaintiff was inadvertent, the court still would find that defendant waived the privilege with respect to the reference to "Legal Counsel" in the first

_____

passage, all of the fifth sentence of the third passage, and all of the fourth passage. These portions of the Memorandum, however, are not privileged and, therefore, do not raise waiver issues.

sentence of the third passage, all of the second sentence of the third passage, as well as the disclosed portion of the third sentence of the third passage because defendant did not take "reasonable steps to prevent disclosure" of these provisions to plaintiff. Defendant's prior disclosure, therefore, cannot claim the benefit of the protection offered by Federal Rule of Evidence 502(b).

The court recognizes that the clawback agreement provided by the parties to this litigation, which was largely incorporated into the August 26, 2011 Clawback Order entered by the court, provides that inadvertent disclosure of documents "shall not waive any privilege for that Document." The court also recognizes that, "[i]n most circumstances, a party who receives information under such an arrangement cannot assert that production of the information waived a claim of privilege . . . ." Fed. R. Civ. P. 26(f), note. In addition, some courts have held that a clawback agreement may prevent a waiver of the privilege notwithstanding Rule 502(b) if the parties or the court intended for it to have that effect. See Zivali v. AT&T Mobility LLC, No. 08 Civ. 10310(JSR), 2010 WL 5065963, at *1 (S.D.N.Y. Dec. 6, 2010) (holding that a protective order displaced Rule 502(b) because it provided the parties with "the right to claw back at any time, without waiver, any and all privileged or otherwise protected documents that they inadvertently produced." (emphasis added)).

In the case presently before the court, however, the Clawback Order entered by the court, which largely incorporated the parties' clawback agreement, provides that it is "not to be construed to expand or diminish any party's rights or obligations as described in FRE 502." Cf. Potomac Elec. Power Co. & Subsidiaries v. United States, 107 Fed. Cl. at 730 (rejecting a proposed clawback arrangement that diminished "'the parties' responsibility to take reasonable precautions against [the] disclosure of privileged documents'" under Rule 502 (alteration in original) (quoting Williams v. District of Columbia, 806 F. Supp. 2d 44, 49 (D.D.C. 2011) (citations omitted))). The parties' clawback agreement likewise provides that it is "intended to be consistent with FRE 502 and is not to be construed to expand or diminish either Party's rights or obligations as therein described." The court's Clawback Order and the parties' clawback agreement, therefore, do not prevent the court from analyzing defendant's disclosures under Rule 502. See Excel Golf Prods., Inc. v. MacNeill Eng'g Co., No. 11 C 1928, 2012 WL 1570772, at *1–3 (N.D. Ill. May 3, 2012) (applying Rule 502(b) notwithstanding the existence of a protective order relating to inadvertent disclosures when the protective order "mandate[d] that inadvertent disclosures be handled consistent with Fed. R. Evid. 502").

Because defendant's production of the four copies of the partially redacted version of the Memorandum to plaintiff during discovery occurred "in a federal proceeding," unlike Lt. Col. Richardson's disclosures in 2006, the requirements of Federal Rule of Evidence 502(a) must be met in order for defendant's waiver to extend to other privileged communications. Fed. R. Evid. 502(a). Rule 502(a) requires that defendant's "waiver," rather than defendant's disclosure, be intentional before subject matter waiver can apply. Fed. R. Evid. 502(a)(1). That defendant waived the privilege by intentionally disclosing privileged communications to plaintiff, therefore, does not

necessarily indicate that defendant intentionally waived the privilege with respect to those communications.  See Bear Republic Brewing Co. v. Cent. City Brewing Co., 275 F.R.D. 43, 47 (D. Mass. 2011) ("The Rule provides that the 'waiver' rather than the disclosure has to be intentional . . . .  The requirement that the 'waiver' be 'intentional' (rather than the 'disclosure' be 'intentional') was added to the draft at the Advisory Committee's April, 2007 meeting to ensure that there would be no subject-matter waiver unless the party knew that the disclosure would operate as a waiver."); 23 Wright & Graham, Federal Practice & Procedure § 5441 (Supp. 2012) ("The Committee then engaged in a stealth alteration of the law of waiver. . . .  The Committee, purporting to limit 'subject matter waiver to intentional disclosures,' amended Rule 502 to add a provision to subdivision (a)(1) [to] require that 'the waiver [be] intentional.'"  (first alteration added)).  Some courts have held  that an intentional disclosure may constitute an intentional waiver "absent credible evidence that the disclosing party was unaware of the contents of the disclosed material."  See US Airline Pilots Ass'n v. Pension Guar. Corp., 274 F.R.D. 28, 31 (D.D.C. 2011) (citing Lerman v. Turner, No. 10 C 2169, 2011 WL 62124, at *9–10 (N.D. Ill. Jan. 6, 2011), objections overruled, 2011 WL 494623 (N.D. Ill. Feb. 4, 2011)).

Regardless of whether defendant's intentional disclosure of the four copies of the partially redacted version of the Memorandum constituted an intentional waiver of the privilege, fairness considerations indicate that defendant's disclosure should not result in a waiver with respect to other privileged communications.  See Fed. R. Evid. 502(a).  Although subject matter waiver is more likely to apply to disclosures that occur in the context of litigation, because it "is grounded in principles of fairness and serves to prevent a party from simultaneously using the privilege as both a sword and a shield," the court determines that defendant's waiver of the privilege with respect to the second sentence, and portions of the first and third sentences of the third passage does not extend to the remainder of the Memorandum, or to other privileged communications, because defendant's partial disclosure does not appear to give defendant a tactical advantage over plaintiff.  See In re Seagate Tech., LLC, 497 F.3d at 1372.  By plaintiff's own admission, the information contained in the third passage has "already been disclosed to Oasis."  In addition, that defendant now seeks to redact the third passage contradicts the notion that defendant intentionally disclosed a portion of the Memorandum to plaintiff in order to obtain a tactical advantage during litigation.  Defendant's disclosure appears to be the result of inadequate precautions "[r]ather than . . . some sort of scheme to bolster its defense."  See Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. at 521.  Fairness dictates that the remainder of the privileged content in the third passage, and other protected communications, continue to be protected from disclosure, absent defendant's future use of the disclosed communications for an adversarial gain.  See Fed. R. Evid. 502(a).

**CONCLUSION**

Defendant's Motion to Substitute Appendix Pages and Compel Clawback of a Privileged Document is **GRANTED IN PART** and **DENIED IN PART**.  The court **DIRECTS** defendant, in conformance with this Order, to submit a copy of the partially

redacted version of the Memorandum that it previously produced to plaintiff during discovery, beginning at Bates number US 00046713.  In conformance with this Order, defendant shall leave unredacted the non-privileged material appearing under the heading "Statement of Objectives/Performance-Based Work Statement" at Bates number US 00046717, including the entirety of the second passage that defendant seeks to redact.  Defendant also shall leave unredacted the non-privileged material appearing under the heading "CLIN Structure," including the reference to "Legal Counsel" in the first sentence of the third passage that defendant seeks to redact, as well as the second sentence in its entirety: "To accomplish this, the Government and Contractor agreed to establish a priced CLIN for Bottled Water production capability with non-priced CLINs for production capability for each facility."  Defendant also shall leave unredacted the following statement in the third sentence of the third passage that defendant seeks to redact: "Additionally, the Government established a new non-priced CLIN for equipment lease . . . . "  In addition, defendant shall leave unredacted the fifth sentence of the third passage: "The revised CLIN structure is listed as capability per plant and a water production equipment lease for each option period."  Defendant also shall leave unredacted the fourth passage that defendant seeks to redact, which appears at Bates number US 00046724: "This memo was endorsed by: Major Michael S. Martin, USAF Deputy Command Judge Advocate Joint Contracting Command – Iraq/Afghanistan *See next page*." (emphasis in original).  Finally, defendant shall leave unredacted the last page of the Memorandum at Bates number US 00046725, which indicates, in part, that Maj. Martin "concur[red] with the foregoing summary of JA involvement with restructuring contract W27P4A-05-C-0002."  The court **DIRECTS** the parties to refile the Joint Appendix in conformance with this Order.

The court also **DIRECTS** plaintiff not to reference those portions of the Memorandum the court has determined to be privileged during the course of the litigation of the above-captioned case, unless waived by defendant.  Specifically, plaintiff shall not reference the contents of the first passage that defendant seeks to redact, or the following bolded language from the third passage that defendant seeks to redact:

> Legal Counsel **[redacted]**.  To accomplish this, the Government and Contractor agreed to establish a priced CLIN for Bottled Water production capability with non-priced CLINs for production capability for each facility. Additionally, the Government established a new non-priced CLIN for equipment lease, **[redacted]**.  The revised CLIN structure is listed as capability per plant and a water production equipment lease for each option period.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

35